FLANNERY v. NEW ENGLAND TRANSP. CO. et al.

(District Court, S. D. New York. December 23, 1908.)

BROKERS (§ 106*) — COSTS (§ 40*)—CONTRACT—COMPENSATION—OFFER OF JUDGMENT.

On a conflict of testimony, *held* that the libellant was entitled to recover in the first instance from Kellam with a right of recovery over on his part from the New England Company of a portion of the amount decreed to be due. Costs allowed notwithstanding an offer of judgment because the offer did not definitely state to whom the amount was due.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 149; Dec. Dig. § 106;* Costs, Cent. Dig. § 105; Dec. Dig. § 40.*]

(Syllabus by the Judge.)

Martin A. Ryan, for libellant.
Robinson, Biddle & Benedict, for New England Transp. Co.
Benjamin F. Einbigler, for Kellam.

ADAMS, District Judge. This action was brought by John H. Flannery against The New England Transportation Company to recover $364.36 for the transportation of a cargo of coal from Port Reading to New London, Connecticut, on his boat, the Essie Flannery, on or about the 10th of May, 1907. The answer admits the due delivery of the coal but states that the cargo was shipped under a stipulation that

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the boat should be towed by the boats of the respondent at an agreed towage of 18 cents per ton for the round trip, which condition was not carried out by the respondent to its damage in the sum of $151.92, and further that the respondent admits that there is due from the respondent to the libellant the sum of $212.44, for which amount it offers to allow a judgment to be taken, with costs to the date of the answer, the 6th day of April, 1908. On the same day, the respondent filed a petition alleging that the petitioner entered into an agreement on or about the 2d day of May with George W. Kellam, whereby the petitioner agreed to transport the coal in question on the said boat but at the rate of 50 cents per ton, with the understanding that the boat should be towed by the respondent's steam tugs at the rate of 18 cents per ton for the round trip. The respondent further alleges that the said Kellam in making an arrangement for the transportation of the coal failed to provide that the respondent's tugs should do the towing, whereby it lost the towage amounting to $151.92. Further the respondent averred that it filed with the petition—

"a bond with good and sufficient security to pay the libellant, or any party herein under the process asked herewith, all costs and damages and expenses which may be awarded against the petitioner. * * *"

It then prayed that if a decree should be granted, it would be only for the sum of $212.44 and that the balance of the claim should be assessed against the said Kellam. The answer of Kellam to the libel admitted all of its allegations and in answering the petition denied all of its allegations tending to impose liability upon him. The New England Company subsequently filed an amended petition repeating many of its former allegations. It then repeated, in substance, its allegations relating to the transportation of the coal by Kellam but changes them so that it averred that it was understood and agreed that the boat when loaded should be towed by the tugs of the petitioner and that thereafter Kellam hired the Flannery but not on the terms he was authorized to charter her in that he failed and neglected to make an agreement with the libellant that the tugs of the respondent should do the towing and permitted her to be towed by other tugs and that there was lost to the petitioner the towage amounting to the said sum of $151.92. The petitioner further avers that the condition that the boat should be towed by its tugs was an essential part of the contract to carry the coal, without which it would not have made the contract. An answer was filed by Kellam to the amended petition in which he denied the alleged agreement.

Upon the pleadings thus amended, the case went to trial and the libellant examined Kellam, who testified that he was a shipping broker, had been in that business for 21 years and was so engaged at the time when he made arrangements with the Transportation Company with regard to a cargo of coal on May 2, 1907, in a conversation with Mr. Lester and Mr. McGuire of the Transportation Company. He said that Mr. McGuire met him down stairs in the company's building, No. 1 Broadway, and asked him if he could get him some boats. The latter said he would let him know, that boats were very scarce and at a premium; that later he was in the company's office and Mr. Lester,

Manager of the Company, also asked him if he could get some boats; that he was in a bad way to fill their contracts because he could not get barges; that he then left the office and met a Mr. Netter, a broker, whom he asked if he had any boats light; that Mr. Netter replied that he had a boat of about 900 tons capacity if that would fit the order, and he (Kellam) then went and·asked if they could use a boat of 900 tons; that Mr. Lester said that he had 750 tons to go to New London and they were to pay extra towing to the New England Company and for him to go down and see what he could do; that he went to Mr. Netter who he said would not entertain a 750 tons charter but if Kellam could get 900 tons at 55 cents he would take it; that he returned to the New England Company and told them that he ·could secure a boat at 55 cents for 900 tons and they said they would not pay 55 cents but to secure 900 tons for 50 cents; that he went down to Mr. Netter and after 20 minutes or half an hour got him to take the order; that he then returned to Mr. Lester and he said, "Go ahead, close and send to Port Reading," and he told Mr. Netter it was all right, to send the boat down there; that up to that time nothing had been said about towing; that about a half of an hour afterwards he dropped in to the New England Company's office and told them to send the boat down; that Mr. Lester said he would give a confirmation of the order· and he wrote a letter naming the rate of freight and at the bottom it was said the boat is to tow with the New England Company; the witness said in connection with this provision, "I dont know anything about that." That letter, which would have been of some use in the matter, was missing, having been given to Mr. Netter who was said to be dead at the time of the trial. What was said to be a copy was produced by the New England Company but was not recognized by the witness; he said, however, that it contained the provision, "the boat is to tow with us at 18 cents a ton;" that the witness then said to Mr. Lester that "I would do the best I could to have Mr. Netter tow with their line, that I had already completed my charter with him and considered it closed but would do what I could to have the boat tow with him"; that he then tried to find Mr. Netter but was unable to do so for several hours, when he handed him the letter and Mr. Netter said, "the boat was on her way, she had been reported already and the charter had been completed." The witness further stated that his business was that of a broker, securing boats for other people, for the transportation of coal and heavy freights and that it was not customary to incorporate in an order for carrying a cargo of coal an agreement with regard to towing and that this was the first time he had ever been asked to do it.

On cross examination, the witness said that throughout this matter, he had been acting as agent for the New England Company; that at the time Mr. Lester gave him the letter, Mr. Lester said: "I want to have that boat tow with us" and "if she don't we will have a loss, we are paying ten cents over the contract price;" that the only other letter he had from the New England Company excepting when the check was sent to him, which he refused because he "had no right to it"; that he received a telephone message from the New England Company that

they understood the Flannery had towed with the Keeler Transportation Company and they would not pay anything over the freight less the towage; that he received from the New England Company a bill with a check less the towing and a subsequent letter, dated June 8th, enclosing the check again, which he also returned. This letter was as follows:

"143 Liberty Street, New York, June 8th, 1907.
New England Transportation Co., 1 Broadway, City.

Gentlemen: I herewith return your check to cover freight on boat Essie Flannery. Mr. John Flannery, owner of the boat, refuses to accept same on account of the deduction of 18 cents per ton for towing which you deduct from his bill. Mr. Flannery says this boat was towed by the Keeler Transportation Co. and not your Company.

Yours very truly, [Signed] George W. Kellam."

He further said, on redirect examination, that he did not work for any particular house but received his commission from the boat owner.

Mr. Flannery testified that Mr. Netter was his outside man and, before his death, secured loads for the libellant's boats; that he paid 20 cents per ton for this towing with the Keeler Company; that the New England Company being his friends, he would naturally call them up first but on this occasion could find no one in their office; that he sent a bill for his freight to the New England Company but they sent it back and told him he had to settle with Mr. Kellam; that he had had a lot of business for that company and it was sometimes the case that an agreement would be made that they should do the towing, but it was not the uniform practice; that the boat was chartered to Mr. Kellam through his (the libellant's) outside man who made an arrangement with Mr. Kellam with regard to the hire of the boat; that his outside man told him that Mr. Kellam had the charter, but he did not mean that Mr. Kellam was the charterer, (Mr. Kellam) was the one who did the chartering; that he (the libellant) did not understand that he had a claim against Mr. Kellam but supposed he would advise the libellant later who the shipper was and the libellant would bill accordingly; that Mr. Kellam hired boats on his own account, but the witness could not find out on this occasion until after the boat had gone with the cargo; that he had never chartered a boat to Mr. Kellam, therefore he did not know that Mr. Kellam had ever chartered a boat for his own use; that he knew Mr. Kellam chartered them for other people acting as a middle man, sometimes as broker and sometimes as agent for other people; that he had known Mr. Kellam for 30 years and all that time Mr. Kellam had been a broker; that he expected Mr. Kellam to direct him to whom he was to get his money from but did not expect that he would pay it himself; that he sent a bill to the New England people when he found out the boat was loaded for them; that he rendered a bill for this work to the New England Company shortly after it was done and they returned it stating they did not recognize him as the party with whom they were dealing; that he did not pay Mr. Kellam a commission on this business but did pay Mr. Netter but could not say to whom the latter paid it.

The respondent then called Mr. Lester as a witness who testified that he was the agent in New York of the New England Company;

that his recollection of this transaction was that Mr. McGuire went out to look for such boats as the company needed; that Mr. Kellam came in and told the witness that he had a boat and asked the particulars regarding freight, demurrage and other conditions; that he explained to Mr. Kellam, "the amount of freight, amount of demurrage and rate of towing charged on his boat"; that Mr. Kellam then went out and was gone some time, then came back and accepted the charter, telling the name of the boat; that the boat went down to Port Reading that night, loaded the next day and came back the night of the day of loading; that he told Mr. Kellam they insisted upon having the towing of the boat; that Mr. Kellam was not their agent, that he understood Mr. Kellam was representing himself in the transaction; that he (the witness) did not know to whom the boat belonged until after the acceptance of the charter when Mr. Kellam came back and gave him the name of the boat; that a confirmation was sent to him by mailing it that afternoon, May 2d, as follows:

"Dear Sir: Agreeable to conversation to-day. We have given you order, full cargo for boat Essie Flannery, Port Reading loading to alongside Allyn's Point, Connecticut. Freight at the rate of fifty cents per ton alongside. Demurrage if any to be billed at $8 per day after reporting and six lay days. It is understood that this boat when loaded will report to us at Packer Dock, Jersey City, for tow at 18 cents per ton for this round trip."

Later, May 6th, the following letter was also sent by the New England Company to Mr. Kellam:

"Dear Sir: Referring to charter of boat Essie Flannery. This morning we learned that this boat went forward on Saturday in tow of Keelers Transportation Line Tug, contrary to the terms of our charter. This will notify you that in paying this charter, we will deduct the round trip towing in accordance with our letter of May 2d."

A bill was sent to Mr. Kellam May 23d, of which the following is a copy:

New England Transportation Company, to George Kellam Dr.

| | |
|---|---:|
| To freighting 844 tons of coal, Port Reading, New Jersey to New London, Connecticut, per boat Essie Flannery, at 50¢ per ton | $422.00 |
| Less advances on bill of lading | 57.64 |
| | $364.36 |
| Sound towing at 18 cents per ton | 151.92 |
| | $212.44 |

The witness further testified that the letter of May 2d did not contain anything that was not said in the conversation and that Mr. Kellam did not object to the letter; that he did not learn that the boat had been towed by the Keeler Towing Company until the following Monday morning and that he then immediately notified Mr. Kellam about it by the above letter of May 6th, to which he received no reply but Mr. Kellam came in and explained that it was no fault of his that the agreement was not carried out and "I told him we knew nobody else in the transaction except him."

Further testimony was given, particularly by the respondent, the New England Company, but nothing of much importance beyond tending to show by subsequent attitudes that the views entertained by the

parties were adhered to by them. The controversy must be determined by what took place between the agent of the respondent, Mr. Lester, and Mr. Kellam.

The burden was of course upon the respondent and it offered nothing directly bearing upon the dispute beyond the testimony of Mr. Lester, which is denied by Mr. Kellam. Mr. Lester's testimony was apparently credible and is supported, to a certain extent, by his subsequent actions. The same with respect to subsequent actions may be said of Mr. Kellam's testimony. He was undoubtedly a broker, but it is possible that he engaged in transactions on his own account and it is strenuously urged by the respondent that on this occasion he did so. The contention that he understood that the respondent was to have an allowance for the towage charge is supported by a portion of his own testimony, where he said:

"By Mr. Ryan: Q. Whom did you see in their office? A. I saw Mr. Lester. He said he had 750 tons to go to New London or Allen's Point, at their option, and they were to pay extra towing to the New England Transportation Company. * * *"

Of course that there was any such understanding is denied in his subsequent testimony, but in a close case of this kind, it is proper that full effect should be given to such significant language, occurring in the examination of a party where the dispute is directly connected with the words of the witness. Why he should have mentioned "extra towing" to the respondent unless it was in contemplation of the parties as contended by the respondent does not appear. In one part of the libellant's testimony it is shown that Mr. Kellam was in the habit of occasionally chartering on his own account. In another part thereof that is denied but I think it may be safely concluded that this was one of the occasions where he was acting as principal instead of being merely a broker.

That the respondent's proctors made a mistake in originally taking the position that Kellam was an agent of the respondent is frankly admitted by them and should not be prejudicial. The correct attitude was assumed when the facts were made clear to them.

There will be a decree for the libellant against Kellam for $364.36 with interest, Kellam to recover over against the New England Company $212.44. The decree will provide that in the event of failure to recover from Kellam the whole amount due the libellant shall be payable by the New England Company.

It is urged by the respondent that there should be no costs allowed after the filing of the answer because an offer of judgment was made therein. The offer was it—

"admits that there is due for the freight of the said 844 tons of coal, less towage as above mentioned, the sum of two hundred twelve and 44/100 dollars ($212.44), for which amount it hereby offers to allow a decree to be taken against it by any one who is entitled thereto, with costs to date."

This, however, was too indefinite to permit any one to take advantage of at the time. It could only be determined at the conclusion of the trial, who was entitled to the benefit of the offer. The costs of the action will follow the decree as usual.